# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SANDRA L. GARZA, ) | 1:07cv0755 DLB |
| ) | |
| ) | |
| Plaintiff, ) | ORDER REGARDING PLAINTIFF'S |
| ) | SOCIAL SECURITY COMPLAINT |
| v. ) | |
| ) | |
| MICHAEL J. ASTRUE, Commissioner ) | |
| of Social Security, ) | |
| ) | |
| Defendant. ) | |
| ) | |

## BACKGROUND

Plaintiff Sandra L. Garza ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her applications for disability insurance benefits and supplemental security income pursuant to Titles II and XVI of the Social Security Act. The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Dennis L. Beck, United States Magistrate Judge.[1]

---

[1] The parties consented to the jurisdiction of the United States Magistrate Judge. On December 27, 2007, the Honorable Lawrence J. O'Neill reassigned the case to the undersigned for all purposes.

1

**FACTS AND PRIOR PROCEEDINGS**[2]

2     Plaintiff filed her applications for supplemental security income and disability insurance

3     benefits on June 29, 2004, alleging disability since August 24, 2001, due to carpal tunnel

4     syndrome ("CTS") in both hands.  AR 64-66, 86-92, 351.  After the claims were denied initially

5     and upon reconsideration, Plaintiff requested a hearing before an Administrative Law Judge

6     ("ALJ").  AR 50-54, 56-60, 355-356.  On April 27, 2006, ALJ James Ross held a hearing.  AR

7     364-390.  ALJ Ross denied benefits on August 14, 2006.  AR 14-23.  The Appeals Council

8     denied review on March 28, 2007.  AR 6-9.

9     Hearing Testimony

10         ALJ Ross held a hearing on April 27, 2006, in Fresno, California.  Plaintiff appeared with

11    her attorney, Robert Christenson.  AR 364.

12    Plaintiff testified that she was almost 48 years old.  She completed the twelfth grade and

13    last worked in August 2001 as a food service worker at the Porterville Development Center.  AR

14    367.  She stopped working because CTS prevented her from performing her duties.  AR 367-368.

15    She was getting clumsy and making mistakes at work due to the pain in her hands.  AR 370.  She

16    eventually had surgeries on both hands, but testified that the surgeries did not work.  She started

17    seeing progress in her right hand, but never in her left hand.  Then, as time went on, her right

18    hand started to deteriorate more.  AR 370-371.

19    Plaintiff explained that both hands fall asleep.  She can sometimes pick up small objects

20    like coins or pens, but most of the time, cannot.  She cannot tie her shoes, has trouble with

21    buttons and no longer wears makeup.  She could write a couple of sentences, but then ends up

22    dropping the pen or letting go.  AR 372.  She can drive only short distances, in town, because her

23    hands fall asleep.  AR 373.  Her mother fixes her hair, she doesn't wear earrings anymore

24    because she can't put the backings on, and she puts the toothbrush down a lot when she brushes.

25    She cannot cut her food with a knife and can only hold a fork in a fist position.  She could not

26    open a jar.  AR 374.  Plaintiff thought she could lift, but not carry, five pounds.  AR 375.

27    _____

28         [2] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

1        Plaintiff believed that she has gotten worse since 2001 because she can do less and less.

2 She doesn't go out in public much.  Plaintiff takes Extra Strength Tylenol for pain.  She also does

3 exercises on a daily basis, two or three times a day, which help.  AR 376.

4        When questioned by the ALJ, Plaintiff explained that she has no income and that her

5 workers' compensation settlement was gone.  AR 378, 387.  Her parents have been supporting

6 her and she has been living with them for a year and a half.  AR 378, 387.

7        After her surgeries, Plaintiff did physical therapy for both hands, although she only did it

8 for three month for the left hand because it seemed to make her hand worse.  AR 379.  The ALJ

9 quested Plaintiff about Dr. Hanker's statement that in July 2002 that her surgeries "led to the

10 resolution of the numbness and tingling in her hands."  AR 381.  Plaintiff indicated that the

11 statement was not correct.  AR 381.  She later explained that she stopped seeing Dr. Hanker

12 because he wasn't doing anything for her.  AR 386.

13    <u>Medical Record</u>

14        On August 29, 2001, Plaintiff underwent motor and sensory nerve conduction studies in

15 both hands.  The study was abnormal and showed evidence of moderate CTS of the median

16 nerves across the writs.  There was no evidence of polyneuropathy or ongoing cervical

17 radiculopathy.  AR 126.

18        Plaintiff underwent right carpal tunnel release on November 27, 2001.  AR 285-286.

19        On February 5, 2002, Plaintiff underwent left carpal tunnel release.  AR 272-273.

20        On March 21, 2002, Plaintiff saw Gregory J. Hanker, M.D.  He reported that Plaintiff was

21 progressing well following her bilateral carpal tunnel releases.  Plaintiff received a refill of

22 Motrin and remained temporarily totally disabled.  AR 269.

23        On May 8, 2002, Plaintiff returned to Dr. Hanker.  He indicated that she was progressing

24 well.  Her right hand had only occasional, mild to slight discomfort, but her left hand still had

25 frequent, slight to moderate discomfort.  Plaintiff was improving slowly.  Dr. Hanker hoped to

26 return Plaintiff to normal duty next month.  AR 142.

27

28

1    _____Physical therapy notes from May 30, 2002, indicate that Plaintiff was experiencing severe

2    left carpal tunnel pain after hiking over the weekend and using the left hand "to grasp tree limbs

3    and branches very strongly as she pulled herself up the hillside." AR 137.

4    _____Notes from Dr. Hanker dated May 30, 2002, indicate that he "admonished [Plaintiff] that

5    she could not engage in these types of activities and expect her hand to remain asymptomatic."

6    AR 263.

7    _____On June 24, 2002, Plaintiff reported to her physical therapist that she was "noticeably

8    better," but still complained of occasional sharp pains near her thumbs. She also reported that

9    she painted the house, with subsequent pain. AR 133. Overall, she was making good progress

10   with wrist motors, grip and pinch in normal ranges for age and gender. The CTS questionnaire

11   indicated "mild disability level." AR 133.

12   _____Plaintiff saw Robert Brennan, PA-C, for Dr. Hanker, on June 25, 2002. She reported that

13   her right wrist was doing well but that she continued to have some pain and sensitivity in the left

14   wrist. There was some mild tenderness on the right, and moderate tenderness and pain with

15   movement on the left. He noted that Plaintiff was having more pain than he would expect,

16   particularly this far out from surgery. Notes from physical therapy indicated that her strength and

17   grips have returned to normal. Plaintiff did not feel that she could return to work because she

18   would be required to lift heavy objects. He instructed Plaintiff to continue with physical therapy

19   and use anti-inflammatories and ice/heat as needed. AR 258-259.

20   _____On July 2, 2002, Plaintiff returned to Mr. Brennan. She complained of increasing pain

21   since working in physical therapy and believed that therapy was making her worse. Mr. Brennan

22   recommended that Plaintiff stop physical therapy to allow her symptoms to resolve. He

23   instructed Plaintiff to continue using Motrin 800 mg, as needed, and ice packs daily. AR 255-

24   256.

25       Also on July 2, 2002, Dr. Hanker released Plaintiff to work. She could not use her hands

26   repetitively for more than 15 minutes, and could not lift over 10 pounds with the right hand, two

27   pounds with the left. AR 251.

28

1    On July 3, 2002, Dr. Hanker indicated that Plaintiff continued to have an excessive

2  amount of subjective pain complaints in both arms.  He recommended that she undergo a return

3  to work capacity evaluation, "as there [was] little else to be gained by continuing a conservative

4  postoperative regime."  AR 253.

5    On July 9, 2002, Plaintiff underwent a functional capacity assessment.  The results were

6  not acceptable for maximum effort.  AR 340-350.

7    Plaintiff was examined by Mr. Brennan on July 16, 2002.  She continued to complain of

8  significant pain in both wrists and indicated that she could not perform "even the light duty that

9  she was prescribed."  She stopped physical therapy because of the pain and uses anti-

10  inflammatories and ice to control the pain.  On examination, she had tenderness over the palmar

11  aspects of the wrists and hands, with significant pain in the hands and wrists with any range of

12  motion.  Grip strengths were extremely weak.  Plaintiff refused medication refills and her

13  temporary total disability was continued.  AR 247-248.

14    Plaintiff saw Dr. Hanker on July 31, 2002, for a Permanent and Stationary Evaluation.

15  She complained of pain in both upper extremities with any activities, along with constant

16  weakness.  On examination of her right arm, there was no evidence of intrinsic muscle weakness

17  or atrophy and she had full range of motion in all digits.  Sensation was normal.  Plaintiff

18  complained of vague and diffuse pain in the right arm, but there were no objective findings to

19  substantiate the complaints.  On the left, she had full range of motion and normal sensation.

20    Dr. Hanker diagnosed status post bilateral carpal tunnel releases, a history of bilateral

21  upper extremity overuse syndromes and bilateral upper extremity pain, etiology indeterminate.

22  He indicated that her surgeries were successful and lead to the resolution of the of the numbness

23  and tingling in her hands.  He believed that her vague complaints of pain were "more than likely

24  associated with pain behavior" and noted that she had very little motivation to return to her past

25  occupation.  He also referenced a functional capacity assessment performed on July 11, 2002, as

26  another example of Plaintiff's lack of maximal effort and her pain behavior.  He believed that

27  Plaintiff's condition was stationary.  Dr. Hanker opined that "almost solely on a subjective basis,

28  because there really is no substantial corroborating objective findings," Plaintiff probably has a

1  disability in both upper extremities in performing very forceful and forceful activities.  He

2  estimated that she lost about 35 percent of her prior capacity.  He believed that vocational

3  rehabilitation should be initiated and that no further care was needed, although Plaintiff could

4  benefit from a continued home exercise program.  AR 240-244.

5  _____On August 30, 2002, Plaintiff saw John M. Larsen for a Qualified Medical Evaluation.

6  Dr. Larsen reviewed Plaintiff's prior medical records.  On examination, Tinel's sign was

7  "exquisitely positive" at the volar wrist crease.  Phalen's sign was also positive.  There was

8  excellent distal sensation, but quite a bit of tenderness about the palmar area.  On the left, there

9  was "exquisite tenderness" about the palm, as well as over her incision.  Tinel's sign was

10 "exquisitely positive" and Phalen's sign was positive.  There was also significant tenderness.  Dr.

11 Larsen diagnosed persistent bilateral upper extremity pain following carpal tunnel releases.  He

12 recommended further diagnosed testing.  AR 223-234.

13 _____On September 18, 2002, Plaintiff underwent an electrodiagnostic medicine evaluation.

14 The study was abnormal and revealed residual focal median neuropathy at the wrist on the right

15 and residual changes at the wrist in the left.  AR 216-218.

16 _____Plaintiff underwent an MRI of her right wrist on October 2, 2002.  The test revealed that

17 her tendons and ligaments were intact, but that there was mild inflammation of the median nerve

18 in the carpal tunnel.  AR 183.

19 _____On December 5, 2002, Plaintiff saw Dr. Larsen for an orthopedic re-evaluation.  Her

20 physical examination was unchanged.  Dr. Larsen reviewed prior medical records, including her

21 prior MRI.  He diagnosed bilateral upper extremity pain, following carpal tunnel releases.  The

22 MRI did not show any significant CTS on the left, although there were residual symptoms on the

23 right.  The electrodiagnostic testing was worse on the right.  He did not recommend surgery "in

24 the short run," but noted that it may be necessary in the future.    Dr. Larsen opined that Plaintiff

25 could be considered permanent and stationary, with a 50 percent loss of pre-injury capacity for

26 lifting, pushing, pulling, grasping, pinching, holding, torquing, and performing comparable

27 activities in the right upper extremity, and a 25 to 50 percent loss on the left.  He indicated that

28 retraining should begin as soon as possible.  AR 209-214.

1       On March 25, 2003, Plaintiff saw Charles L. Herring, M.D., for an orthopedic evaluation.

2 He noted that Plaintiff was employed as a food service technician for 22 years. On August 24,

3 2001, she developed pain in her wrists and hands. She complained of constant, sharp pain in her

4 hands and wrists, with pain radiating to her elbows, as well as numbness. On examination, there

5 was some thenar atrophy detected, along with weakness with grip strength. She had positive

6 Tinel's, positive carpal tunnel compression test and Phalen's test bilaterally. The left was much

7 worse than the right. He diagnosed bilateral carpal tunnel releases, with possible recurrence and

8 severity. He opined that she was temporarily totally disabled and gave her Neurontin to see if it

9 helped her pain. AR 202-207.

10       Plaintiff returned to Dr. Herring on April 10, 2003, and continued to complain of

11 significant bilateral wrist pain. On examination, she had positive Tinel's sign, positive carpal

12 tunnel compression tests and positive Phalen's test bilaterally. Dr. Herring also reviewed

13 Plaintiff's prior medical records. He diagnosed bilateral carpal tunnel releases, with possible

14 recurrence and severity, and opined that she may need a repeat surgery despite some

15 improvement. Dr. Herring explained to Plaintiff that another surgery may not fix the problem

16 and that she may always have pain. He noted that he "doubt[s] that she will ever be back to

17 normal without any sort of pain." Plaintiff was instructed to continue her Neurontin and

18 remained temporarily totally disabled. AR 192-199.

19       On July 17, 2003, Plaintiff returned for an orthopedic re-evaluation. She had bilateral

20 wrist pain and stated that her left was worse than the right. On examination, she had positive

21 Tinel's sign and positive Phalen's sign with pain and tenderness along the radial aspect of her

22 right wrist. She was diagnosed with bilateral carpal tunnel release, with possible recurrence and

23 severity. Plaintiff was a possible candidate for revision of carpal tunnel release. Her options

24 were discussed and she was given Neurontin. AR 188-190.

25       On August 19, 2003, Dr. Larsen submitted a Qualified Medical Evaluation supplemental

26 report after reviewing medical records from Dr. Hanker and reviewing his chart "in detail." He

27 last saw Plaintiff on November 26, 2002. As to Dr. Hanker's opinion that Plaintiff was

28 permanent and stationary as of July 31, 2002, and his estimate of her grip strength, Dr. Larsen

7

1  stated that "Dr. Hanker should refrain from speculating in medicolegal reporting."  He also

2  faulted Dr. Hanker for not recognizing her abnormal electrodiagnostic test.  Based on these

3  "deficiencies," Dr. Hankers' reports did not change Dr. Larsen's opinions.  AR 184-187.

4  _____On January 28, 2004, Dr. Hanker indicated that he agreed with the retraining option of

5  Child Day-Care Center worker.  AR 238.

6  _____On August 4, 2004, Plaintiff saw Juliane Tran, M.D., for a neurologic evaluation.

7  Plaintiff reported that her surgeries did not help at all and that she continues to have persistent

8  pain and numbness in the her hands, bilaterally, up to the elbows.  Plaintiff further reported that

9  she can cook, wash dishes and do some chores, but cannot do yard work, vacuum or mop.  On

10  examination, Phalen's test was positive in both hands, but Tinel's test was negative.  There was

11  no evidence of atrophy in the hands.  Sensory exam was decreased in both hands.  Plaintiff had

12  decreased strength in both hands, mostly due to pain.  She gave good effort throughout the

13  examination, but it was difficult to appreciate the specific muscle nerve pattern weakness due to

14  the diffuse decrease in strength due to pain.  Dr. Tran opined that Plaintiff should be restricted

15  from activities involving frequent motion of both wrists, or activities involving frequent

16  fingering.  She could perform occasional fingering.  She would also be restricted from activities

17  involving frequent grasping with both hands, but could perform occasional grasping.  Plaintiff

18  could lift 25 pounds occasionally, 10 pounds frequently.  AR 305-308.

19  _____On August 24, 2004, a State Agency physician completed a Physical Residual Functional

20  Capacity Assessment.  Plaintiff could occasionally lift/carry 20 pounds, 10 pounds frequently,

21  and could sit, stand and walk for six hours each.  She was unlimited in pushing and pulling.  She

22  was unlimited in reaching, but had to avoid forceful, repetitive twisting and turning.  She could

23  perform frequent fingering.  AR 309-316.  This opinion was affirmed in October 2004.  AR 316.

24  _____On July 19, 2005, Plaintiff saw Hanh My Hoang, M.D., for complaints of pain in both

25  hands.  She was taking over-the-counter medication for pain.  Muscle strength in her hands was

26  four out of five.  Dr. Hoang diagnosed chronic hand pain, status post CTS surgery.  He instructed

27  her to take Motrin, as needed, and return in four weeks.  AR 328.

28

8

1       Plaintiff continued to complain of hand pain in August 2005 and January 2006.  AR 323-

2  324.

3       ALJ's Findings

4       The ALJ determined that Plaintiff's history of CTS, status post release in both wrists, was

5  a severe impairment.  Despite this, she retained the residual functional capacity ("RFC") to lift

6  and carry 20 pounds occasionally, 10 pounds frequently, and sit, stand and walk six hours each.

7  She had to avoid repetitive forceful twisting with either hand.  AR 18-19.  He further found that

8  Plaintiff could not perform her past relevant work, but was able to perform a significant range of

9  unskilled, light work.  AR 22-23.

10                                **SCOPE OF REVIEW**

11       Congress has provided a limited scope of judicial review of the Commissioner's decision

12  to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations,

13  the Court must determine whether the decision of the Commissioner is supported by substantial

14  evidence.  42 U.S.C. 405 (g).  Substantial evidence means "more than a mere scintilla,"

15  *Richardson v. Perales*, 402 U.S. 389, 402 (1971), but less than a preponderance.  *Sorenson v.*

16  *Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975).  It is "such relevant evidence as a

17  reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at

18  401.  The record as a whole must be considered, weighing both the evidence that supports and

19  the evidence that detracts from the Commissioner's conclusion.  *Jones v. Heckler,* 760 F.2d 993,

20  995 (9th Cir. 1985).  In weighing the evidence and making findings, the Commissioner must

21  apply the proper legal standards.  *E.g.*, *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).

22  This Court must uphold the Commissioner's determination that the claimant is not disabled if the

23  Secretary applied the proper legal standards, and if the Commissioner's findings are supported by

24  substantial evidence.  *See Sanchez v. Sec'y of Health and Human Serv.*, 812 F.2d 509, 510 (9th

25  Cir. 1987).

26                                   **REVIEW**

27       In order to qualify for benefits, a claimant must establish that he is unable to engage in

28  substantial gainful activity due to a medically determinable physical or mental impairment which

                                        9

has lasted or can be expected to last for a continuous period of not less than 12 months.  42

U.S.C. § 1382c (a)(3)(A).  A claimant must show that he has a physical or mental impairment of

such severity that he is not only unable to do her previous work, but cannot, considering his age,

education, and work experience, engage in any other kind of substantial gainful work which

exists in the national economy.  *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).

The burden is on the claimant to establish disability.  *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th

Cir. 1990).

In an effort to achieve uniformity of decisions, the Commissioner has promulgated

regulations which contain, inter alia, a five-step sequential disability evaluation process.  20

C.F.R. §§ 404.1520 (a)-(f), 416.920 (a)-(f) (1994).[3]  Applying this process in this case, the ALJ

found that Plaintiff: (1) had not engaged in substantial gainful activity since the alleged onset of

her disability; (2) has an impairment or a combination of impairments considered "severe" based

on the requirements in the Regulations (20 CFR §§ 416.920(b)) (history of CTS, status post

release in both wrists); (3) does not have an impairment or combination of impairments which

meets or equals one of the impairments set forth in Appendix 1, Subpart P, Regulations No. 4;

(4) cannot return to her past relevant work; but (5) retains the RFC to perform a significant

amount of unskilled, light work.  AR 18-23.

In challenging the decision, Plaintiff argues that (1) the ALJ failed to obtain vocational

expert ("VE") testimony; (2) the RFC was inconsistent with the adopted opinions of Dr. Hanker

and Dr. Tran; (3) the ALJ should have adopted Dr. Larsen's findings; and (4) the ALJ erred in his

credibility analysis.

## DISCUSSION

A.      Use of VE

        Plaintiff first argues that the ALJ should have used a VE to determine the effect of the

additional limitations on the occupational base.  Specifically, she contends that the ALJ's finding

that she could not perform repetitive forceful twisting required the testimony of a VE.

---

[3]All references are to the 2002 version of the Code of Federal Regulations unless otherwise noted.

In general, where a claimant suffers only from exertional limitations, the ALJ may apply the Grids at step five to match the claimant with the appropriate work. *Reddick v. Chater*, 157 F.3d 715, 729 (9th Cir. 1998).  The ALJ may apply the Grids in lieu of taking VE testimony only when the Grids accurately and completely describe the claimant's abilities and limitations. *Id.* (citing *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985)).  If a claimant's non-exertional limitations "significantly limit the range of work" he can perform, mechanical application of the grids is inappropriate and a vocational expert would be needed to describe what, if any, jobs existed in the national economy that the claimant could perform. *Desrosiers v. Sec'y Hous. Health Serv.*, 846 F.2d 573, 577 (9th Cir. 1988).  The determination of whether a non-exertional limitation significantly limits the range of work the claimant is able to perform is left to the ALJ. *Id.*

Here, the ALJ found that Plaintiff had the ability to perform unskilled, light work, but could not perform repetitive, forceful twisting with either hand.  AR 19.  In evaluating Plaintiff's ability to perform other work, he found that the additional limitations "have little or no effect on the occupational base of unskilled light work."  AR 23.  The ALJ then applied Rule 202.21 of the Medical-Vocational Guidelines and determined that Plaintiff was not disabled.  AR 23.

It was within the ALJ's discretion to determine whether the limitation in repetitive, forceful twisting significantly limited the range of work Plaintiff could perform.  Indeed, this was the only nonexertional limitation imposed and Plaintiff's RFC otherwise allowed for the full range of light, unskilled work.  Moreover, the limitation did not preclude *all* twisting, but only that of a forceful and repetitive nature.

Plaintiff cites SSR 83-10 in support of her argument.  SSR 83-10 defines light work as requiring "use of arms and hands to grasp and to hold and turn objects," but not requiring "use of the fingers for fine activities to the extent required in much sedentary work."  Plaintiff argues that the ALJ's finding that she could not perform repetitive, forceful grasping "seems to fall under the 'hands to grasp and to hold and turn objects' requirement."  Opening Brief, at 8.  However, SSR 83-10 does not require that the grasping and holding be either repetitive or forceful.

1    The ALJ's decision that Plaintiff's nonexertional limitation did not significantly limit the

2    range of available work was supported by substantial evidence and free of legal error.

3    B.    The Opinions of Dr. Hanker and Dr. Tran

4    Next, Plaintiff argues that the ALJ's RFC finding is inconsistent with his adoption of the

5    opinions of Dr. Hanker and Dr. Tran.  She believes that the ALJ erred by not including additional

6    manipulative limitations imposed by Dr. Hanker and Dr. Tran in his RFC finding, even though

7    he gave their opinions "great weight."  AR 22.  In her reply, Plaintiff clarifies that she is not

8    arguing that the ALJ was required to adopt their opinions in their entirety, but rather that the ALJ

9    did not explain his reasons for rejecting the additional limitations.

10    Cases in this circuit distinguish among the opinions of three types of physicians: (1) those

11    who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant

12    (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining

13    physicians).  As a general rule, more weight should be given to the opinion of a treating source

14    than to the opinion of doctors who do not treat the claimant.  *Winans v. Bowen*, 853 F.2d 643,

15    647 (9th Cir.1987).  At least where the treating doctor's opinion is not contradicted by another

16    doctor, it may be rejected only for "clear and convincing" reasons.  *Baxter v. Sullivan*, 923 F.2d

17    1391, 1396 (9th Cir.1991).  Even if the treating doctor's opinion is contradicted by another

18    doctor, the Commissioner may not reject this opinion without providing "specific and legitimate

19    reasons" supported by substantial evidence in the record for so doing.  *Murray v. Heckler*, 722

20    F.2d 499, 502 (9th Cir.1983).

21    The opinion of an examining physician is, in turn, entitled to greater weight than the

22    opinion of a nonexamining physician.  *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir.1990);

23    *Gallant v. Heckler*, 753 F.2d 1450 (9th Cir.1984).  As is the case with the opinion of a treating

24    physician, the Commissioner must provide "clear and convincing" reasons for rejecting the

25    uncontradicted opinion of an examining physician.  *Pitzer*, 908 F.2d at 506. And like the opinion

26    of a treating doctor, the opinion of an examining doctor, even if contradicted by another doctor,

27    can only be rejected for specific and legitimate reasons that are supported by substantial evidence

28    in the record.  *Andrews v. Shalala*, 53 F.3d 1035, 1043 (9th Cir.1995).

1    Here, the ALJ discussed Dr. Hanker's treatment history as well as Dr. Tran's consultive

2    examination.  AR 20-21.  This review included Dr. Hanker's July 31, 2003, opinion that Plaintiff

3    could not perform very forceful, or forceful, activities.  AR 20-21.  The ALJ also included Dr.

4    Tran's opinion that Plaintiff could not perform activities involving frequent motion in both

5    wrists, frequent fingering and frequent grasping.  AR 21.

6    In assessing their opinions, he states that he gives them both "great weight."  As Plaintiff

7    points out, though, the only manipulative limitation included in the RFC was a preclusion from

8    performing "repetitive forceful twisting with either hand."  AR 19.  In support of her argument,

9    Plaintiff points to Dr. Hanker's July 2, 2002, opinion that she could not perform repetitive hand

10   movements for more than 15 minutes at a time, and his July 31, 2002, opinions that she had lost

11   35 percent of her post-injury capacity for forceful or repetitive grasping and holding and that she

12   could perform repetitive hand activity for a maximum of 20 minutes.  AR 244, 246, 251.  She

13   also points to Dr. Tran's limitations in frequent motions with both wrists, frequent grasping and

14   frequent fingering.  AR 307-308.

15   Plaintiff correctly argues that the ALJ does not explain why he rejected the additional

16   manipulative limitations imposed by Dr. Hanker and Dr. Tran.  While an ALJ need not explain

17   why he rejects each and every aspect of a physician's opinion, the opinion must reveal "specific,

18   legitimate inferences" to support his decisions.  *Id.* at 755 ("As a reviewing court, we are not

19   deprived of our facilities for drawing specific and legitimate inferences from the ALJ's

20   opinion.").

21   The ALJ's decision fails to satisfy this standard and leaves the Court with no rationale to

22   review.  In other words, the ALJ simply fails to explain why he rejected the additional

23   manipulative limitations imposed by Dr. Hanker, Plaintiff's treating physician, and Dr. Tran.

24   Although the ALJ seems to question Plaintiff's subjective complaints, he neither specifically

25   states that he rejected the additional manipulative limitations on this basis, nor does he make

26   such an inference.

27   The ALJ's failure to explain his rejection cannot be considered harmless in light of the

28   weight of the physicians' opinions.  In rejecting the additional manipulative limitations, the ALJ

13

essentially adopted the opinion of the State Agency physician over that of treating physicians and

consultive examiners, all of whom imposed more limiting manipulative restrictions.  While the

ALJ may adopt the non-examining opinion over those of examining sources in certain

circumstances, the Court cannot determine whether the ALJ's decision to do so here was proper.

Accordingly, the ALJ's treatment of the medical opinions was not free of legal error and

the action must be remanded.  Instructions on remand will be discussed at the end of this opinion.

C.      Dr. Larsen's Opinion

In a similar argument, Plaintiff contends that the ALJ erred by failing to adopt Dr.

Larsen's opinion.  Specifically, Plaintiff disagrees with the ALJ's characterization of Dr.

Larsen's opinion as "inconsistent" with the objective findings.  AR 22.

As set forth above, the ALJ can reject a contradicted treating doctor's opinion by

providing "specific and legitimate reasons" supported by substantial evidence in the record for so

doing. *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir.1983).  Here, Plaintiff cites Dr. Larsen's

December 5, 2002, orthopedic reevaluation, in which he opined that Plaintiff had lost 50 percent

of her prior capacity for lifting, pushing, pulling, grasping, pinching, holding, torquing, and

performing comparable activities in the right upper extremity, and 25 to 50 percent in the left

upper extremity.  AR 212.

In rejecting Dr. Larsen's opinion, the ALJ explains that it is "duly noted" but given "little

weight as it is inconsistent with the objective findings."  AR 22.  This statement, however, is not

supported by substantial evidence.  A September 2002 electrodiagnostic study revealed residual

focal median neuropathy at the wrist on the right and residual changes at the wrist in the left.  AR

216-218.  An October 2002 MRI of Plaintiff's right wrist revealed mild inflammation of the

median nerve in the carpal tunnel. AR 183.  Moreover, there were numerous reports of positive

objective tests, i.e., Tinel's and Phalen's, as well as a notation of atrophy.  AR 188-190, 192-199,

202-207, 223-234, 305-308.  Dr. Larsen's opinion was also similar to those of Dr. Hanker and

Dr. Tran.  While a 50 percent loss may not translate neatly into a functional limitation, Dr.

Larsen's opinion is not inconsistent with the evidence.

The ALJ's treatment of Dr. Larsen's opinion is not supported by substantial evidence.

D.       Credibility Analysis

          Finally, Plaintiff contends that the ALJ erred by finding her not credible.

          The ALJ is required to make specific findings assessing the credibility of plaintiff's subjective complaints. *Cequerra v. Secretary of HHS*, 933 F.2d 735 (9th Cir. 1991). "An ALJ is not 'required to believe every allegation of disabling pain' or other non-exertional impairment," *Orn v. Astrue*,495 F.3d 625, 635 (9th Cir. 2007) (citation omitted). In rejecting the complainant's testimony, "the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Lester v. Chater,* 81 F.3d 821, 834 (9th Cir. 1996) (quoting *Varney v. Secretary of Health and Human Services,* 846 F.2d 581, 584 (9th Cir. 1988)). Pursuant to Ninth Circuit law, if the ALJ finds that the claimant's testimony as to the severity of her pain and impairments is unreliable, the ALJ must make a credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony. *Thomas v. Barnhart,* 278 F.3d 947, 958 (9th Cir. 2002).

          "The ALJ may consider at least the following factors when weighing the claimant's credibility: '[claimant's] reputation for truthfulness, inconsistencies either in [claimant's] testimony or between [her] testimony and [her] conduct, [claimant's] daily activities, [her] work record, and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which [claimant] complains." *Id.* (citing *Light v. Soc. Sec. Admin.,* 119 F.3d 789, 792 (9th Cir. 1997). "If the ALJ's credibility finding is supported by substantial evidence in the record, we may not engage in second-guessing." *Id.*

          The ALJ's credibility analysis begins with his finding that although Plaintiff may have some limitations due to her impairments, she was not precluded from all sustained work activity. AR 21. He characterized her credibility as poor for numerous reasons, including a notation in the record questioning her motivation to work and her extreme subjective pain. AR 21-22. The ALJ may use "ordinary techniques" in addressing credibility. *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997), and may make inferences "logically flowing from the evidence." *Macri v. Chater*, 93 F.3d 540, 544 (9th Cir. 1996).

1  The ALJ also questioned Plaintiff's pursuit of treatment.  He explained that she was not

2  "undergoing any aggressive medical treatment," had no treatment in 2004, was only seen twice in

3  2005, and had not had treatment since January 2006.  AR 22.  He also noted that Plaintiff took

4  only Tylenol for pain, had not required hospital or emergency care, and no physician had found

5  her unable to work.  AR 22.  The ALJ next noted Plaintiff's good progress in June 2002 and

6  found that there was no indication that she was considering revision of her carpal tunnel release.

7  *Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005) (ALJ is permitted to consider lack of

8  medical treatment in assessing credibility).

9  In her opening brief, Plaintiff suggests that it is "logical to assume that she had no income

10 and no job, she had no medical coverage to pay for ongoing doctor treatments or for medication

11 stronger than Extra Strength Tylenol."  Opening Brief, at 18.  It is true that "[d]isability benefits

12 may not be denied because of the claimant's failure to obtain treatment he cannot obtain for lack

13 of funds."  *Orn v. Astrue,* 495 F.3d 625 (9th Cir. 2007) (citing *Gamble v. Chater*, 68 F.3d 319,

14 321 (9th Cir.1995)).  Plaintiff did not specifically testify that she could not afford medical

15 treatment, although she did state that her workers' compensation settlement money had run out

16 and that she was supported by her parents.  There is also a notation from January 2006 that

17 Plaintiff declined a referral because she not have insurance.  AR 323.  However, Plaintiff's lack

18 of insurance did not appear to be an impediment to receiving treatment from the clinic, as she did

19 in January 2006 and twice in 2005.  In fact, during one visit in July 2005, she was described as a

20 "known patient to the clinic."  AR 328.  While Plaintiff may disagree with the ALJ's inference, it

21 was supported by substantial evidence and the Court may not engage in second-guessing.  *Fair v.*

22 *Bowen*, 885 F.2d 597, 604 (9th Cir. 1989).

23 Finally, the ALJ noted Plaintiff's daily activities and the fact that she went hiking three

24 months after her left carpal tunnel release.  As to her hiking, the ALJ explained that she used her

25 left hand to pull herself up a hillside.  AR 22.  Of course, the ALJ is entitled to consider a

26 claimant's activities that are not consistent with allegations of disabling pain.  Plaintiff suggests

27 that even though she used her left hand to hike, "apparently it was not ready or capable of doing

28

16

1    this action as she has suffered the consequences of severe pain." Opening Brief, at 19. However,

2    less than one month later, Plaintiff reported pain after painting her house. AR 133.

3         Turning to her daily activities, the ALJ cites her ability to prepare meals, perform some

4    household chores and drive. AR 22. He also notes that she can grocery shop, "but needs

5    assistance to lift groceries." AR 22. The ALJ is entitled to examine a claimant's daily activities.

6    Although Plaintiff cites activities that she is unable to do, such as tie her shoes and fix her hair,

7    these inabilities do not negate the activities she is able to engage in.

8         The ALJ's credibility analysis is supported by substantial evidence and is free of legal

9    error.

10   E.   Remand

11        Section 405(g) of Title 42 of the United States Code provides: "the court shall have the

12   power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying,

13   or reversing the decision of the Secretary, with or without remanding the cause for a rehearing."

14   In social security cases, the decision to remand to the Commissioner for further proceedings or

15   simply to award benefits is within the discretion of the court. *McAllister v. Sullivan*, 888 F.2d

16   599, 603 (9th Cir. 1989). "If additional proceedings can remedy defects in the original

17   administrative proceedings, a social security case should be remanded. Where, however, a

18   rehearing would simply delay receipt of benefits, reversal and an award of benefits is

19   appropriate." *Id.* (citation omitted); *see also Varney v. Secretary of Health & Human Serv.*, 859

20   F.2d 1396, 1399 (9th Cir.1988) ("Generally, we direct the award of benefits in cases where no

21   useful purpose would be served by further administrative proceedings, or where the record has

22   been thoroughly developed.").

23        Here, the Court finds that remanding the action for further proceedings is appropriate.

24   Upon remand, the ALJ must reevaluate the medical opinion evidence, including opinions as to

25   Plaintiff's functional capacity, and provide sufficient reasons should he choose to reject the

26   additional manipulative limitations. In reviewing the medical opinions, the ALJ should conform

27   to the standards set forth in *Orn v. Astrue*, 495 F.2d 625 (9th Cir. 2007). The ALJ should also

28   employ the assistance of a VE, if necessary.

1

**CONCLUSION**

2        Based on the foregoing, the Court finds that the ALJ's decision is not supported by

3   substantial evidence and is therefore REVERSED and the case is REMANDED to the ALJ for

4   further proceedings consistent with this opinion.  The Clerk of this Court is DIRECTED to enter

5   judgment in favor of Plaintiff Sandra L. Garza and against Defendant Michael J. Astrue,

6   Commissioner of Social Security.

7

8        IT IS SO ORDERED.

9        **Dated:   July 17, 2008**          **/s/ Dennis L. Beck**
                                        UNITED STATES MAGISTRATE JUDGE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28